# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 98-CA-00063-SCT

*LESLIE KAY KING BROCATO*

*v.*

*CHRISTOPHER TODD BROCATO*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/11/97 |
| TRIAL JUDGE: | HON. DENNIS M. BAKER |
| COURT FROM WHICH APPEALED: | PANOLA COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | STEVE McCORD |
| ATTORNEY FOR APPELLEE: | ROBERT H. BROOME |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 1/21/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE PITTMAN, P.J., SMITH AND MILLS, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. Leslie Kay King Brocato ("Leslie") and Christopher Todd Brocato ("Chris") were married in Phillips County, Arkansas on June 18, 1988. They were divorced by decree of the Panola County Chancery Court on December 18, 1992. There are two minor children of the marriage, Jennifer Brooke Brocato ("Jennifer") , born July 31, 1989, and Edwin Ross Brocato, nicknamed Timber ("Timber"), born April 21, 1985. Timber is the natural son of Leslie and was adopted by Chris.

¶2. Following the decree of divorce, Leslie had primary custody, control, care and responsibility of the two children until a Modification of the Divorce Decree on July 26, 1996, when custody of both was given to Chris. This modification was primarily predicated upon Leslie's substance abuse and eating disorder problems. Prior to this modification, Leslie and the two children were living in Desoto, Texas with Leslie's mother. The Order for Modification gave Chris full custody and Leslie limited visitation only in the home of Chris or James King, Leslie's father.

¶3. Since the modification, Chris has used the assistance of his parents, Billie and Sammie Brocato, as well as James King, in rearing the children. In fact, at some point soon after the modification in 1996, Chris

realized that Jennifer needed a womanly influence and decided to have Jennifer live with his parents in Coahoma County, Mississippi. Meanwhile, Timber had lived with Chris in Batesville until April 1997 when he began staying with James King, his maternal grandfather. Timber's move was caused by frequent discipline problems at both school and home. Chris regularly disciplined Timber, usually with whippings. He testified that once he even beat Timber until he could beat him no more. Frustrated, he finally decided to take Timber to James King, because that was the only person Timber would obey.

¶4. In contrast, Jennifer has done very well at her paternal grandparents. Jennifer is enrolled in a parochial school and has overcome her deficiencies since residing with the Brocatos. She has received numerous awards and excellent report cards after a slow start. Billie Brocato , her grandmother, has provided her with maternal care and attention as well as tutors and playmates. Chris comes to see her as often as possible, usually three or four times a month, and talks to her on the phone most everyday.

¶5. After completing her rehabilitation at Charter Hospital, Leslie returned to Helena, Arkansas, and lived with her father, James King, and stepmother. She has found employment at the Grand Casino in Tunica County where she works approximately 35 hours per week at $4.75 an hour plus tips. Shortly after Chris left Timber with James King in April of 1997, Leslie moved with Timber to Walls, Mississippi, and enrolled him in Desoto School. James King has continuously provided financial assistance to Leslie and Timber. Timber continues to struggle in school, but the chancellor found that James King's influence was best for the boy.

¶6. On July 9, 1997, Leslie petitioned the Panola County Chancery Court for modification of divorce decree. On October 2 and 3, 1997, Chancellor Dennis M. Baker heard testimony. Subsequently, he ordered that the previous decree be modified in part. The court modified the decree with regards to Timber placing him in the custody of Leslie and required that she be solely responsible for his maintenance and support. The court ordered that Jennifer remain in the custody of Chris and that he be solely responsible for her maintenance and support. The court further ordered that visitation be at all reasonable times for Chris and Timber and left intact the decree that Leslie visit Jennifer only at her father's or Chris'.

¶7. Aggrieved by the chancellor's findings, the Appellant/ Leslie assigns two errors, as follows:

**I. WHETHER THE TRIAL COURT ERRED IN MODIFYING CHILD CUSTODY WITH REGARD TO ONLY ONE OF THE MINOR SIBLINGS.**

**II. WHETHER THE TRIAL COURT ERRED IN REFUSING TO REQUIRE CHRIS BROCATO TO PAY CHILD SUPPORT FOR THE BENEFIT OF THE MINOR CHILD, EDWIN ROSS (TIMBER) BROCATO.**

## STANDARD OF REVIEW

¶8. Our standard of review in custody cases is well settled and is limited:

> "this Court will not reverse a Chancery Court's factual findings, be they of ultimate fact or of evidentiary fact, where there is substantial evidence in the record supporting these findings of fact." ***Smith v. Jones***, 654 So.2d 480, 485 (Miss. 1995)(*quoting **Cooper v. Crabb***, 587 So.2d 236, 239 (Miss. 1991)). Furthermore, the chancellor's findings will not be disturbed when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous or applied an erroneous legal standard. ***Williams v. Williams***, 656 So.2d 325, 330

(Miss. 1995); *Smith*, 654 So.2d at 485; *Chamblee v. Chamblee*, 637 So.2d 850, 860 (Miss. 1994).

****

There must be sufficient evidence in the record supporting the chancellor's opinion for this Court to say that the chancellor has not abused his discretion.

*Touchstone v. Touchstone*, 682 So.2d 374, 377 (Miss. 1996).

## LEGAL ANALYSIS

### I. WHETHER THE TRIAL COURT ERRED IN MODIFYING CHILD CUSTODY WITH REGARD TO ONLY ONE OF THE MINOR SIBLINGS.

¶9. In regards to modification of custody, this Court has stated:

"[t]he prerequisites to a child custody modification are: (1) proving a material change in circumstances which adversely affects the welfare of the child and (2) finding that the best interest of the child requires the change of custody." *Smith v. Jones*, 654 So.2d 480, 486 (Miss.1995). . . .This Court has also noted that "[t]he 'totality of the circumstances' must be considered." *Ash v. Ash*, 622 So.2d 1264, 1266 (Miss.1993)(*citing Tucker v. Tucker*, 453 So.2d 1294, 1297 (Miss.1984)).

*Wright v. Stanley*, 700 So.2d 274, 280-81 (Miss. 1997). In showing a material change in circumstances in the custodial home, the burden of proof is on the movant. *Riley v. Doerner*, 677 So.2d 740, 743 (Miss. 1996)(*citing Ash*, 622 So.2d at 1266).

¶10. Leslie asserts that she has shown a material change in circumstances adversely affecting both the children. Chris contends that a material change in circumstances only exists with regards to Timber. In his bench opinion, the chancellor found unusual circumstances existed in that Chris had voluntarily and independently relieved himself of responsibility over Timber, Jennifer was residing full-time with her paternal grandparents, and Leslie had completed her rehabilitation. Under these facts, this Court should agree that a material change in circumstances in the custodial home has been shown by a preponderance of the evidence. *See Bredemeier v. Jackson*, 689 So.2d 770, 776 (Miss. 1997)(where this Court found that "many things occurred to create material change").

¶11. The polestar consideration in child custody cases is the best interests of the child. *Riley*, 677 So.2d at 744. Both parties assert that the *Albright* analysis is proper, but Leslie contends that the chancellor's denial of a custody modification with regard to Jennifer was clearly erroneous. In *Albright v. Albright*, this Court listed the following factors:

Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to

the parent-child relationship.

*Albright v. Albright*, 437 So.2d 1003, 1005 (Miss. 1983).

¶12. (1) Age and Sex of the Child- Jennifer is a third-grader. Leslie argues that a nine year-old daughter needs to be under the care and supervision of an adult female. Chris agrees generally, but argues instead that his mother Billie Brocato is the best female adult to care for her. The chancellor found that Jennifer's best interests were served by being in the care of Billie Brocato and the custody of Chris. Billie Brocato clearly adores Jennifer and seemingly has a special bond with her. Jennifer's grades, appearance, attitude, and demeanor have all improved since her residence with Billie Brocato.

¶13. (2) Determination of the parent who has the continuity of care prior to the previous modification- Leslie argues that Jennifer has never lived with Chris on a permanent basis since the divorce. Chris counters that when Jennifer arrived at Billie Brocato's after the first modification she was experiencing difficulties in school, her hair was matted, her clothes were too small, and she was introverted.

¶14. (3) Parenting skills- Leslie argues that Chris' parenting skills are non-existent as he has not cared for Jennifer on a daily basis. Chris responds that he has provided the best care possible for Jennifer, his mother Billie. Chris pays her bills, and Billie takes care of her by reading her stories, providing her with playmates and tutors, and even letting Jennifer sleep with her when she is scared.

¶15. (4) Willingness to provide primary child care- Leslie argues that Chris is not providing primary child care by farming their daughter out to his mother. Chris counters that he provides excellent child care for paying for her to attend a parochial school and arranging for her to live with her grandmother who can give her lots of attention.

¶16. (5) Employment of parent and responsibilities of that employment- Leslie argues that Chris is self-employed, which causes him to work long hours six days a week. Chris admits his job responsibilities are burdensome, but counters that it is necessary to provide the best for Jennifer.

¶17. (6) Physical and mental health of the parents- Leslie argues that Chris is somehow mentally disturbed, because he beat Timber until he could be beat no more. As necessitating the first modification, Leslie has experienced substance abuse and eating disorders in the past two years.

¶18. (7) Emotional ties of parent and child- Leslie argues that Chris' ties with Jennifer are weak, because he sees her only two or three times a month. Further, his parents' ties with her are stronger than his. Chris counters that Jennifer comes to his house anytime she wants. Moreover, Leslie has no idea whether Jennifer is involved in school activities or whether she is well-fed or clothed. Finally, Ann Upton, a tutor, testified at trial that Jennifer asked her, "Why does my mommy not love me?"

¶19. (8) Moral fitness of the parents- Leslie argues that Chris is morally unfit, because his girlfriend, Gina French, has spent the night with him while Timber resided there and he has failed to report all of his income to the Internal Revenue Service. Chris counters that he sends Jennifer to a parochial school so she can receive the best moral training possible.

¶20. (9) Home, school, and community record of the children- there is no argument that Jennifer is thriving in the parochial school thanks to her grandmother's efforts as well as her tutors and teachers. As evidence, Jennifer has received numerous awards for improvement and excellence in her studies.

¶21. (10) Other relevant factors- Leslie argues that the trial court's ruling splits custody of the children in contravention of this Court's mandate in *Sellers v. Sellers,* which stated:

> The Court shall in all cases attempt insofar as possible, to keep the children together in a family unit. It is well recognized that the love and affection of a brother and sister at the ages of these children is important in the lives of both of them and to deprive them of the association ordinarily would not be in their best interests.

*Sellers v. Sellers*, 638 So.2d 481, 484 (Miss. 1994)(quoting *Sparkman v. Sparkman*, 441 So.2d 1361, 1362 (Miss. 1993)). Chris contends that the situation here is not ordinary. The facts at trial showed that while in Leslie's care, Jennifer had regressed in school as well as emotionally. By prior modification, Leslie lost custody of Jennifer, because of her drug and eating disorder problems.

¶22. Since this modification, the chancellor found that Jennifer has thrived in the custody of her father and under the care of her grandmother. In fact, the chancellor stated:

> And, then, I am being asked to place Jennifer with the mother and Timber. That, to me, is no more than saying, "Well, let's sacrifice her, to, maybe, try to put them together and, maybe help Timber," when, what I hear about Jennifer, is that she is doing good--not only doing good, but she is doing great. She has received these awards. She is attending the Catholic school there at St. Elizabeth's in Clarksdale. . . . And if I were to change the custody of this child and put this child with the brother, under the guise of saying, "I'm going to keep the children together," all it would amount to would be sacrificing this little girl. And I'm not going to do it. It is not in the child's best interest. There is no way this child could be benefitted. I saw no testimony which would suggest to me that this child could be benefitted. And, to the contrary, I can see many reasons not to do so. . . .

> [I]t would be devastating to put this daughter any place other than where she is, now, and to be in anybody's custody and control, other than the father, in whose custody and control she is in, now.

Therefore, the unusual facts and circumstances do not suggest the chancellor erred in allowing custody to be split. *See **Bredemeier v. Jackson**, 689 So.2d 770, 776-77 (Miss. 1997)*(unusual circumstances warranted split custody where prior modification had already split the siblings).

¶23. Next, Leslie argues that the split custody decree should not be affirmed, because this Court has indicated that elaborate provisions for visitation and vacation are necessary in split custody situations to ensure the children are together as much as possible, and no such provisions were made. ***Bowen v. Bowen**, 688 So.2d 1374, 1381-82 (Miss. 1997)*(*citing **Bell v. Bell***, 572 So.2d 841, 846 (Miss. 1990)). The chancellor found the prior visitation schedule adequate and made no comment as to visitation for the siblings. The prior visitation schedule stated:

> Leslie Kay King Brocato shall have visitation with the minor children only in the home of the petitioner, Christopher Todd Brocato or under the direct supervision of her father, James King or her brother James King, Jr. Direct supervision meaning that they will be with her and the children at all times. That the supervised visitation will remain in full force until such time as the Respondent is able to prove unto the Court that she is able to care for the children in a manner that would be in their best interest.

Given the unusual circumstances, the chancellor found it best that Leslie only be able to visit with Jennifer under the supervision of Chris or her father. Leslie contends that this schedule is not an "elaborate provision" for assuring that the children are together as much as possible.

¶24. At trial, Billie Brocato testified that she has never denied Leslie or her father, James King, the opportunity to visit or to talk on the phone with Jennifer. However, the chancellor's split custody ruling is inconsistent. He awards custody of Timber to Leslie, yet reinstates the prior visitation schedule with regard to Jennifer. Thus, the implication is that Timber's best interests are served by being in Leslie's custody and care, but at the same time, Leslie is denied visitation with Jennifer, unless supervised. How can she be fit to parent one sibling, and at the same time, unworthy to visit the other child without direct supervision?

¶25. The chancellor's ruling in this regard is ambiguous, because he offers no explanation whatsoever for this inconsistency. In fact, the chancellor overruled Leslie's Motion to Clarify Judgment on this very point. Therefore, this Court finds that "elaborate provision" for visitation between the siblings, as well as between the mother and the daughter, have not been satisfied in accord with *Bell* and *Bowen*.

¶26. In conclusion, this Court finds that the chancellor did not err in splitting custody of the minor children between the parents based upon the best interests of the children and the unusual aspects of this particular situation. The record is clear that the chancellor carefully considered the factors set forth by this Court and made corresponding findings of fact. However, the chancellor is required to clarify the visitation schedule for Leslie and Jennifer as well as Timber and Jennifer.

## II. WHETHER THE TRIAL COURT ERRED IN REFUSING TO REQUIRE CHRIS BROCATO TO PAY CHILD SUPPORT FOR THE BENEFIT OF THE MINOR CHILD, EDWIN ROSS (TIMBER) BROCATO.

¶27. The awarding of child support is within the sound discretion of the chancellor. This Court has on numerous occasions held that it will not disturb a chancellor's determination of child support "unless the chancellor was manifestly in error in his finding of fact and manifestly abused his discretion." *McEachern v. McEachern*, 605 So.2d 809, 814 (Miss. 1992) (citing *Smith v. Smith*, 585 So.2d 750, 753 (Miss. 1991); *Powers v. Powers*, 568 So.2d 255, 257-58 (Miss.1990)). *See* Miss.Code Ann. § 93-5-23 (Supp.1998). Leslie does not contest this authority, but argues that the chancellor erred in not requiring Chris to pay child support for Timber in accord with Miss. Code Ann. § 43-19-101 (Supp. 1998). It states:

(1) The following child support award guidelines shall be a rebuttable presumption in all judicial or administrative proceedings regarding the awarding or modifying of child support awards in this state:

Number Of Children Percentage Of Adjusted Gross Income

Due Support That Should Be Awarded For Support

1 14%

2 20%

3 22%

4   24%

5 or more   26%

(2) The guidelines provided for in subsection (1) of this section apply unless the judicial or administrative body awarding or modifying the child support award makes a written finding or specific finding on the record that the application of the guidelines would be unjust or inappropriate in a particular case as determined under the criteria specified in Section 43-19-103.

Miss. Code Ann. § 43-19-101 (Supp. 1998). In the context of the statutory guidelines, this Court has stated:

Certainly the guidelines are relevant and may be considered by a chancellor as an aid, but the guidelines may not determine the specific need or the specific support required. This is to be done by a chancellor at a time real, on a scene certain, and with a knowledge special to the actual circumstances and to the individual child or children.

*Thurman v. Thurman*, 559 So.2d 1014, 1017-18 (Miss.1990); *Grogan v. Grogan*, 641 So.2d 734, 740 (Miss. 1994).

¶28. The chancellor basically held that each custodial parent would be financially responsible for the child under their care, when he stated:

Now, I don't know what all the mother is making. I know what she said she's making. She may not be making much more than that. The effect of this whole thing is, that the two collective families are rearing these two children, because the mother said her father was assisting her. Well, his mother is assisting Chris. And, so, he is going to retain custody of Jennifer, and he is going to be responsible for all of Jennifer's needs, all of her upbringing, all of her rearing, all of her medical, everything. And the mother is going to be responsible for all of that for the son. And such assistance as her father wants to, can do, or should do, or will need to do, is a matter for him.

The chancellor did not cite the statute in reasoning its deviation from the guidelines. However, it is reasonably clear that the above stated rationale satisfies Miss. Code Ann. § 43-19-103(g) and (i) (1993), which state:

(g)The particular shared parental arrangement, such as where the noncustodial parent spends a great deal of time with the children thereby reducing the financial expenditures incurred by the custodial parent, or the refusal of the noncustodial parent to become involved in the activities of the child, or giving due consideration to the custodial parent's homemaking services.

****

(i) Any other adjustment which is needed to achieve an equitable result which may include, but not be limited to, a reasonable and necessary existing expense or debt.

¶29. The issue then boils down to whether the chancellor satisfied Section 43-19-101(2) which provides that where the amount specified in the guidelines is increased or decreased, the chancellor should make a written finding or specific finding on the record that the application of the guidelines would be unjust or

inappropriate. *See also* **[Knutson v. Knutson](#), 704 So.2d 1331, 1334 (Miss. 1997)**. In ***McEachern***, this Court upheld a chancellor's rebuttal of the presumption where the record included a written finding that the guidelines were inappropriate and unjust. ***McEachern***, 605 So.2d at 814.

¶30. However, in ***Knutson***, this Court overturned the Court of Appeals, who had affirmed a chancellor's deviance from the guidelines, because the chancellor did not reference the guidelines in making his specific findings on why the application of the guidelines would be inappropriate or unjust. **[Knutson](#), 704 So.2d at 1335**. The same situation exists in the instant case, because there is no direct reference by the chancellor to the guidelines or this subsection of the code. The chancellor therefore erred in not referencing the statutory guidelines in making his specific findings of fact regarding child support.

## CONCLUSION

¶31. Based upon the best interests of the children and the unusual aspects of this particular situation, this Court finds that the chancellor did not err in splitting custody of the minor children, Timber Brocato and Jennifer Brocato, between the parents, Leslie Brocato and Chris Brocato. The record is clear that the chancellor carefully considered the factors set forth by this Court and made corresponding findings of fact. Therefore, the chancellor's decision to split custody of the minor children is affirmed.

¶32. However, this Court reverses and remands this case in order for the chancellor to clarify the ambiguous visitation schedule for Leslie and Timber with Jennifer. Furthermore, in regards to the failure to provide child support for Leslie, this Court remands this case for the chancellor to specifically reference, in writing, why the statutory guidelines were inappropriate or unjust, as required by Miss. Code Ann. § 43-19-101(2).

**¶33. AFFIRMED IN PART; REVERSED AND REMANDED IN PART FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, ROBERTS, MILLS AND WALLER, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY.**